# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | **CR 12-0573-PHX-ROS** |
| ) | |
| vs. ) | Phoenix, Arizona |
| ) | October 10, 2012 |
| Luis Alberto Hernandez-Flores,) | 1:41 p.m. |
| ) | |
| Defendant. ) | **SEALED** |
| ) | |
| _____) | |

### BEFORE: THE HONORABLE LAWRENCE O. ANDERSON, MAGISTRATE JUDGE

### EXCERPTED TRANSCRIPT OF PROCEEDINGS

### DETENTION HEARING

APPEARANCES:

For the Government:
U.S. Attorney's Office
By: **KAREN S. MCDONALD**, ESQ.
40 North Central Avenue, Suite 1200
Phoenix, AZ  85004

For the Defendant Hernandez-Flores:
Law Office of Cameron A. Morgan
By: **CAMERON A. MORGAN**, ESQ.
4295 North 75th Street
Scottsdale, AZ  85251

Transcriptionist:
Linda Schroeder
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

1          THE COURT:  All right.  We're back on the record now.

2     This is the sealed portion of today's detention hearing.  I've

3     been busily reviewing the filings in this particular case, the

4     government's response to the motion for redetermination of

5     release conditions.  I think the motion, response, and reply, I

6     think, have all been sealed.

7          I guess I want to start off by asking what is the

8     current status of Mr. Hernandez's immigration or the

9     proceedings in front of an immigration judge, if you know,

10    Ms. McDonald?

11         MS. MCDONALD:  Your Honor, what I know is that the

12    bond that had previously been granted him was revoked, and

13    there is an ICE hold on him.  Should he be released in the

14    federal case here, he would be taken into ICE custody.

15         There is a hearing scheduled on his deportation in

16    December.  And that's pretty much the extent of what I know.

17         THE COURT:  Okay.  Let me find out if Mr. Morgan has a

18    different view of things or perhaps concurs in what the

19    government has mentioned here on the record.

20         MR. MORGAN:  Your Honor, I've spoken with Richard

21    La Paglia, who is his immigration attorney.  Mr. -- And I've

22    also reviewed the documents as we provided to the Court in our

23    reply and also the state's document that shows the bond was

24    cancelled.

25         It's my understanding that after he was taken into

1    custody, the bond was cancelled because he was in custody.

2    However, the bond was never returned to his wife, and in fact

3    ICE still has it.

4            THE COURT:  How much was it?

5            MR. MORGAN:  $5,000.  And Mr. La Paglia seems to

6    believe that in the event this Court was to grant release

7    conditions, that the immigration court would either reinstate

8    the $5,000 bond that it still has or alternatively simply

9    follow the same -- go along with the district court's release

10   conditions.

11           THE COURT:  All right.  Well, regarding the bond, it's

12   a different jurisdiction, so I'm not going to address that.

13   But if he's going to be detained, then clearly the money should

14   be returned to whoever posted it.

15           There are some attachments to your sealed document 76.

16   It appears that there was a hearing scheduled for today at

17   11:00.  It's just mere fortuity that this hearing was set this

18   afternoon, I think.

19           What significance do these documents have from your

20   perspective, Mr. Morgan?

21           MR. MORGAN:  Your Honor, my client is currently

22   applying for a Green Card based on the fact that his wife is an

23   American citizen, and his children are American citizens.  That

24   proceeding -- That request was proceeding along, and he was

25   scheduled for biometrics today.

1          THE COURT:  What does that mean?  What does biometrics

2     mean?

3          MR. MORGAN:  His fingerprints and any other

4     information they need to verify that he doesn't have any

5     criminal record that would prohibit him from getting a Green

6     Card.

7          Mr. La Paglia has been continuing that along for a

8     couple of months now, and it's my understanding that today's

9     biometrics hearing was -- is being reset, I think, for, like,

10    ten days or two weeks or something.

11         THE COURT:  All right.  So what was set for today was

12    this hearing to take fingerprints and other things?

13         MR. MORGAN:  It's not really a hearing, Judge.  You

14    just go in front of an immigration person, and they take

15    whatever (indiscernible) --

16         THE COURT:  Okay.  Kind of like being processed

17    through the marshal service downstairs.

18         Ms. McDonald.

19         MS. MCDONALD:  Although, Your Honor, I would like to

20    make some further comment on the status of where he is at with

21    respect to immigration.

22         I -- The government disputes the -- I guess I would

23    call it characterization that Mr. Hernandez-Flores is on the

24    cusp of getting a Green Card.  He is in deportation

25    proceedings.  And the only document that I have been able to

locate as of yet that was filed by Mr. La Paglia in connection

with those deportation proceedings was a request for a

determination -- redetermination on custody, which is what

originally I'm believing got him the bond.

I do not even -- I am not even aware of him having

filed anything asking for relief from deportation.  And the --

It would appear that the effort to deport him rests rather

heavily on his 2001 arrest and conviction for assault and

disorderly conduct.  And I've looked at the police report

related to that.  He was attempting to get a former

mother-in-law out of his house.  He had -- Her hand was in the

doorway.  He slammed the door on her hand a number of times and

amputated at least one finger.

And I have the police report if the Court is inclined

to view it.  I have reviewed Mr. Hernandez-Flores's A-file as

of around April, and I did not see a request in there for

relief from deportation, which would be, I would think, the

vehicle that would be used in order to try to be relieved of

deportation and in fact be admitted for citizenship or at least

status here.  I'm sorry.  Status.

And so it's the view of the United States that what

happens to Mr. Hernandez-Flores downstream from here with

respect to immigration is very much in doubt and would not be

quite as hopeful a picture in the eyes of the government as

defendant might want it to be.

1       THE COURT:  Okay.  Let me follow up a number of

2   thoughts that I had while you were -- and Mr. Morgan were

3   making your statements to me.

4       Number one, my decision today will not consider in any

5   way his present application for release with bond.  I'm sure

6   Mr. Morgan has explained to his client that if I were to

7   release Mr. Hernandez today, that he's not going to get out of

8   custody until an immigration judge allows him to get out of

9   custody and presumably on that bond.  So he would not be

10  receiving any credit on this federal case if he stays in

11  custody on the immigration hold.

12      I'm assuming that's a conversation you've had with

13  your client, Mr. Morgan?

14      MR. MORGAN:  Yes, that is correct, Your Honor.

15      THE COURT:  Okay.  Secondly, I have the pretrial

16  services report here, and you brought up the assault.  I assume

17  that's the one in 2001 when he received two years of probation.

18  Is that right, Ms. McDonald?

19      MS. MCDONALD:  Yes, Your Honor.

20      THE COURT:  Are there any other convictions?  I see a

21  number of charges regarding drugs and money laundering and

22  misconduct with weapons, et cetera.  And I want to make sure I

23  don't confuse this case with so many others that I've seen.

24  But is that the only conviction that you're aware of?

25      MS. MCDONALD:  Yes, Your Honor.

1          THE COURT:  Okay.

2          MR. MORGAN:  Your Honor, may I correct for the record?

3          THE COURT:  Yes.

4          MR. MORGAN:  I believe he's got a DUI conviction from

5   ten years ago or something like that.

6          THE COURT:  Right.  Would that have been in '98?

7          MR. MORGAN:  I believe so, Your Honor.

8          THE COURT:  That's the latest one I have in this

9   pretrial services report.

10         Okay.  And it has a disposition of unknown.  But he

11  served his sentence on that.  It was a misdemeanor.  And there

12  are no longer any follow-ups on that particular conviction.

13         MR. MORGAN:  No.  I believe it's just a simple first

14  offense DUI, one day in jail.

15         THE COURT:  Okay.  All right.  Thank you.  What --

16  Maybe the best way to cut to the chase here is let me kind of

17  throw out some issues and questions and then, once my questions

18  are answered, then give the parties an opportunity to make

19  their record or present any proffers they wish to make.

20         I'm wondering if your case is falling apart,

21  Ms. McDonald.  I've read your response to the motion for

22  redetermination of release conditions.  And although I don't

23  see that you've categorically said you're not going to call

24  Mr. Chambers, that you seem to think that you can make out your

25  case based upon other information.

1     And then I'm reading the reply that you haven't had a

2  chance to respond to -- because we don't usually allow that --

3  by Mr. Morgan, and it appears that you've conceded that you

4  will not be using any of the evidence that was obtained in the

5  execution of a search warrant in this case because of an

6  alleged inaccuracy or misrepresentation in the affidavit.  Am I

7  understanding the government's position correctly regarding the

8  search warrant at least?

9     MS. MCDONALD:  Your Honor, the United States is today

10  probably already by now filing a notice of our willingness to

11  forgo in our case in chief any fruits of the seven search

12  warrants that were executed on the day of arrest here.

13     But our case is most certainly not falling apart.  I

14  hate to make it sound all too convenient here, but there was

15  not a lot obtained from the search warrants that were executed

16  here.

17     The cornerstone and the crux of the government's case

18  is the conversations had between the CS in this case and

19  Mr. Hernandez-Flores either in person, face to face, or on the

20  phone when he was wired, transcripts of which exist for all of

21  them.

22     The conversations were fairly overt.  There certainly

23  was the use of a lot of code.  But even at times the defendant

24  here appeared so comfortable with the CS and was so trusting of

25  him that he lapsed in a number of -- on a number of occasions

from code into explicit language.  And the transcripts are the

cornerstone of the case.

Now, the government concedes that Mr. Chambers has

more than a lot of impeachment material to be cross-examined

about.  That is -- The body of impeachment material is

corralled by the United States, by the DEA specifically, and

it's turned over.

The United States agreed to work with Mr. Chambers in

connection with Mr. Hernandez-Flores with the caveat that

everything downstream after their happenstance meeting would be

recorded, which it was.

And so the United States is not of the opinion that

the case is falling apart.  The case is what it was at the

point that we charged.  It rests predominantly on the

transcripts.

That being said, we disclosed a subset of the relevant

information regarding Mr. Chambers early in deference to the

significance of the information, because Mr. Chambers did in a

number of criminal cases perjure himself.

To cut to the chase here a little bit, while he

perjured himself in a number of categories, including his past

education, his payment of taxes on income he earned from the

DEA, about a number of things, he was never determined,

according to the investigation the DEA conducted internally, he

was never found to have perjured himself with respect to case

1   details.  There were a number of cases that were dismissed that

2   were in progress at the time that this information came to

3   light.  There were a number of cases where there were already

4   convictions obtained which were appealed, and as far as I

5   know -- Well, I'm sure Mr. Morgan has a better handle on what

6   happened to all of the other cases downstream.  But this -- All

7   of the cases historical and in progress and recently convicted

8   at the time that this story came to light in 2000 were dealt

9   with accordingly.

10          Mr. Chambers began being used by the DEA again

11  somewhere around 2008.  He was in the District of Arizona in

12  the end of 2011 on another case.  And the government has

13  maintained all along that this was a happenstance meeting.  The

14  CS was in the middle of an operation on another investigation

15  completely and totally unrelated to this investigation and

16  happened upon Mr. Hernandez-Flores.

17          And so the government, with the caveat that all would

18  be recorded, went forward with the investigation, which

19  resulted in the delivery of and seizure of almost one kilo of

20  heroin.

21          THE COURT:  Mr. Morgan quotes you at the bottom of

22  Page 2 and the top of Page 3 in document 76 that when you were

23  in front of Chief Judge Silver on the 24th of September

24  regarding the protective order motion, the government admitted

25  that Mr. Chambers is an important witness in this case, and it

1    does not want to proceed without him, and that the government

2    stopped short of saying that it could not or would not proceed

3    without him as a witness.  Is that a fair statement of your

4    position then or today?

5         MS. MCDONALD:  I would not say so, Your Honor.  What I

6    think I put in my pleading was that while the government could

7    imagine a way where this case could be tried without

8    Mr. Chambers testifying, it's the government's present

9    intention to put him on the stand.  That's a discretionary

10   strategy decision, and it is my intention as I stand here

11   today.

12        Some of what has happened in connection with this

13   case, though, does address the issues of what was disclosed

14   regarding Mr. Chambers and when and, you know, because of the

15   defense attorney's reaction to the material that was disclosed.

16        The United States examined the search warrants and

17   particularly the affidavit which was drawn up in support of

18   those seven search warrants, and we realized at that point that

19   the affiant, DEA Special Agent, described the CS as reliable

20   with no explanatory caveat attached to that.

21        And upon reflection, we feel that that was a failure

22   of candor to the Court, and so that's why we have filed the

23   notice today that we will forgo all of the search warrant

24   material, but our case -- the case was already charged by

25   indictment at the time the search warrants were conducted.

1          THE COURT:  Out of curiosity, did I sign any of those

2     search warrants?

3          MS. MCDONALD:  No, Your Honor.  It was

4     Magistrate Judge Duncan.  And one of the -- Well, a couple of

5     the things that I have today are the three prior transcripts

6     related to detention hearing issues on this case, one of which

7     pertains to Mr. Hernandez-Flores -- and I have that, the

8     original detention hearing -- and then there were two dates

9     where Mr. Sandoval was addressed with his detention issues.

10          And I have the transcripts, and I've numbered them as

11     exhibits, and are prepared to provide them to the Court,

12     because we think that -- we thought it was important to review

13     all of the representations we made about this CS and his

14     reliability, because that appears to be the crux of

15     Mr. Morgan's -- the thrust of his argument for this Court

16     today.

17          And with respect to the two detention hearings that

18     were held with Mr. Sandoval --

19          THE COURT:  Can I stop you there?

20          I know I did the detention hearing for Mr. Hernandez.

21     Did I do the detention hearing for Mr. Sandoval?

22          MS. MCDONALD:  Yes, Your Honor.

23          THE COURT:  Okay.  So tell me what's significant about

24     the Sandoval detention hearing that's relevant to this

25     proceeding.

1    MS. MCDONALD:  The -- There were -- On the first date
2  the United States made oral representations to the Court about
3  the strength of the case.  And just so that this issue is
4  entirely fleshed out, the United States made reference -- and I
5  was at the hearing, so this was me speaking -- I made reference
6  to the DEA's use of a long time CS with no qualification as to
7  his reliability or the impeachment materials behind him.
8    The second date of the Sandoval detention hearing
9  Special Agent Dustin Gillespie, who is the case agent and who
10  was the affiant on the search warrants, testified.  And during
11  his testimony he made reference to the CS being extremely
12  reliable.  In his mind it was in connection with this case
13  because everything was recorded, and that was his thought
14  process.
15    But I just wanted to get the record clear on what has
16  been, you know, what representations have been made to the
17  various courts and where there was no clarification or no
18  caveat when he was described as reliable.
19    We think that that was a misstep and an omission on
20  the part of the government.
21    That being said, we do not believe that our case is
22  undermined in any significant way.  It will be an interesting
23  trial, and the cross-examination will probably be one for the
24  record books, but, nevertheless, we stand on the strength of
25  the transcripts.

1      And I have copies with me here in court of all of the

2 transcripts of the recorded conversations between this

3 defendant and the CS.

4      THE COURT:  Have you provided them to Mr. Morgan?

5      MS. MCDONALD:  Yes.  They've been disclosed since

6 arraignment time frame.

7      THE COURT:  Okay.

8      MS. MCDONALD:  But the reason why I disclosed the

9 grand jury transcript is because that is a really succinct

10 recitation of the points in the transcripts where what the

11 conversation was was about drug transacting.

12      And I would also just point out to the Court that in

13 the grand jury, the United States brought out in summary

14 fashion the impeachment material related to the CS.  And so

15 that's in the record.  And we would argue that any --

16      THE COURT:  That's in the grand jury transcript?

17      MS. MCDONALD:  It's in the grand jury transcript.  It

18 appears at the very end after all the testimony went in.  It

19 was one of the end points of the presentation.

20      And so the United States would argue that that

21 appearing in the grand jury transcript cures any error or

22 omission, and it relates directly to the charges in this case.

23 It supports the charges in this case.  And we believe that if

24 we get to trial, if there is ever a motion made to dismiss this

25 case, if the district court ever took the extreme position of

1    dismissing all charges based upon the outrageousness of the

2    government's use of this CS, then if we get to trial, we do

3    believe that we have a very strong chance of conviction.

4          THE COURT:  Well, I'm really troubled, Ms. McDonald,

5    candidly, that we've got this disclosure to the grand jury on

6    March the 20th of this year, and there were no such disclosures

7    in this case or this defendant and Mr. Sandoval -- that's kind

8    of troubling to me -- unless I've got the dates wrong.

9          MS. MCDONALD:  Well, Your Honor, when all of the

10    subset of the discoverable -- Well, the partial version of the

11    discovery issues surrounding this CS were sent out to both

12    counsel months, several months ago.  I would have to check my

13    file to reconstruct when it was sent out.  But it was a long

14    time ago.

15          THE COURT:  I'm not sure I understood what you just

16    said.  If I've had the two detention hearings in this case

17    after the grand jury transcript and grand jury convened to

18    issue their indictment -- which I suspect that's the case --

19    it's very troubling to me that that wasn't disclosed.  And I

20    know you're disclosing it now.  But maybe I've got the dates

21    wrong.  But according to the grand jury transcript, they met on

22    March the 20th of this year, and everything in this file is

23    after March the 20th.

24          MS. MCDONALD:  I'm sorry.  I'm not following what --

25          THE COURT:  You told me that in the transcript, which

1    I have not read, there is a disclosure about Mr. Chambers.

2              MS. MCDONALD:  Yes.

3              THE COURT:  Okay?

4              MS. MCDONALD:  Yes.

5              THE COURT:  About -- I don't know what exactly it

6    says.  He's -- what? -- been unreliable in the past, committed

7    perjury, I'm guessing?

8              MS. MCDONALD:  Yes.

9              THE COURT:  Okay.  Nevertheless, the indictment was

10   returned.

11             But we've had subsequent hearings, especially with DEA

12   Agent Gillespie, who testified he was very reliable,

13   notwithstanding the disclosure to the grand jury.  That's very

14   troubling to me.

15             MS. MCDONALD:  Your Honor, that's why we proffer the

16   transcripts today.  But in -- extremely early on in the case

17   and arguably before any of it would be required by the law, we

18   voluntarily disclosed a couple of months ago the -- a gleaned

19   portion of the discoverable material as to this CS.

20             THE COURT:  Well, I appreciate disclosing later than

21   not at all, but my point that I'm trying to communicate to you

22   is here I've got sworn testimony and proffers made in court

23   about the reliability of a confidential source or informant

24   when at least the agent knew that that wasn't true.  That is

25   extremely troubling.  And I'm not trying to put you on the spot

1    because I haven't questioned you regarding what your knowledge

2    was back earlier in this case, but I -- just troubling me.

3         Let's kind of start from the very beginning.  If we

4    were to exclude anything that Mr. Chambers did that's not

5    verifiable by an audio recording, what do we have in your case?

6         We've got recorded dialog, right?

7         MS. MCDONALD:  Yes.

8         THE COURT:  All right.  And I think you tell me in the

9    grand jury transcript it pretty much succinctly sets forth what

10   the conversations were, right?

11        MS. MCDONALD:  Yes.

12        THE COURT:  And essentially you could tell by reading

13   the transcript that this was clearly a drug deal and not

14   selling automobiles or something, right?

15        MS. MCDONALD:  Correct, Your Honor, and --

16        THE COURT:  Okay.  We've got video.

17        MS. MCDONALD:  There is pole cam footage of the

18   initial meeting between the CS and the defendant.

19        THE COURT:  Okay.

20        MS. MCDONALD:  It's grainy, but it exists.  There is

21   no audio of that initial meeting.

22        THE COURT:  All right.

23        MS. MCDONALD:  Every single--

24        THE COURT:  Go ahead.

25        MS. MCDONALD:  That has been disclosed.  Entire

1    discovery has been out for quite some time in this case.

2         THE COURT:  Okay.

3         MS. MCDONALD:  And then every subsequent conversation

4    either face to face or over the telephone was recorded.

5         THE COURT:  All right.  So you mentioned -- I haven't

6    seen it.  You've seen it.  You disclosed it to Mr. Morgan.

7    From your point of view, can you tell it's Mr. Hernandez in the

8    video?

9         MS. MCDONALD:  Your Honor, I haven't seen it myself.

10        THE COURT:  You haven't.  Okay.

11        MS. MCDONALD:  The agent tells me that they can verify

12   that it's the CS because they can identify the clothing that he

13   was wearing that day.

14        With respect to the identification of it being

15   Mr. Hernandez, the agent -- there were no agents in the area,

16   and so it would probab -- I don't think you can identify it

17   from -- him specifically from the pole cam footage.

18        THE COURT:  Okay.  What other -- Do you have

19   admissions from Mr. Hernandez after he's been arrested?

20        MS. MCDONALD:  No, Your Honor.

21        THE COURT:  Okay.  So you have telephone recorded

22   conversations?

23        MS. MCDONALD:  Yes.

24        THE COURT:  And Mr. Chambers is on one end of the

25   conversation, right?

1          MS. MCDONALD:  In all cases, yes.

2          THE COURT:  All right.  And they're all in English?

3          MS. MCDONALD:  Yes.

4          THE COURT:  Okay.  And are they very supportive of the

5     government's case?

6          MS. MCDONALD:  Absolutely, Your Honor.

7          THE COURT:  Have you disclosed those tapes to

8     Mr. Morgan?

9          MS. MCDONALD:  Shortly after arraignment, yes.  They

10    were originally disclosed to Craig Orent, who represented him,

11    and George Klink, who represented the co-defendant.

12         THE COURT:  All right.  What else do you have in terms

13    of objective evidence not considering Mr. Chambers?

14         MS. MCDONALD:  A kilo of heroin.

15         THE COURT:  All right.  Where was that found?

16         MS. MCDONALD:  That was delivered by the co-defendant,

17    who appeared at the time and place that the defendant directed

18    Mr. Chambers to appear, and there would be the kilo that they'd

19    agreed upon delivered to him --

20         THE COURT:  All right.  And so --

21         MS. MCDONALD:  -- for an agreed-upon price.

22         THE COURT:  And so you've got Mr. Hernandez informing

23    Mr. Chambers about when and where to deliver the heroin?

24         MS. MCDONALD:  Telling him where the meeting place was

25    for him to take receipt of the heroin.

1          THE COURT:  Okay.  And -- But Mr. Hernandez was not

2     arrested with Sandoval delivering the heroin?

3          MS. MCDONALD:  Correct.  He was not present at the

4     delivery.

5          THE COURT:  Not present.  Okay.  Other than the

6     rebuttable presumption, why should Mr. Hernandez be detained?

7     It's a very unusual case.  I'm really kind of shocked that the

8     government would continue to use Mr. Chambers with his sordid

9     history.  And I'm going to leave to Chief Judge Silver about

10    what the consequence should be.  That's beyond my pay grade.

11         But I just, you know, as a lower end magistrate judge,

12    I just can't believe the government would continue to use

13    somebody like him to participate in these drug transactions.

14    Now, there may be reasons that the DEA might be able to explain

15    to me, but it just seems to me that it's not fair play.  And I

16    know this is not a game or sport of some kind.

17         All right.  Do you have any doubts that he wants to be

18    here in the United States?  He's married.  He's going to have a

19    child.  He's got family here, his mother and his mother-in-law

20    and his wife.

21         I mean, this is not the kind of situation that I have

22    seen before where someone wants to flee and leave his family

23    here.  And so in terms of, if he were convicted, I assume the

24    safety valve wouldn't apply unless he -- unless he admitted his

25    involvement and responsibility.

1    So I'm trying to look at a guideline calculation here.

2  We've got a prior felony, but it's -- what? -- ten years old.

3    MR. MORGAN:  There's no prior felonies.

4    THE COURT:  You mean the assault's not a felony?

5    MR. MORGAN:  Misdemeanor.

6    THE COURT:  Oh, okay.  Well, it's even better for

7  Mr. Hernandez.  You agree that it's not a felony, Ms. McDonald?

8    MS. MCDONALD:  I don't know whether it is or not, Your

9  Honor.

10    THE COURT:  Okay.  I mean, I'm trying to figure out

11  what else am I missing here other than the concern about

12  flight?

13    I do see a first degree murder charge, but the

14  presumption of innocence applies, and apparently the case was

15  dismissed.

16    So I see no history of crimes of violence except for

17  the assault.

18    And so I'm trying to -- What am I missing here about

19  why he should be detained?

20    MS. MCDONALD:  It's a Class B felony that's a

21  mandatory minimum of five years as the penalty.

22    But his immigration status is the true determining

23  factor here in the eyes of the government.  The fact of the

24  matter is that if he is turned over to INS, we have no control

25  over what happens if he is released here and picked up on their

1  warrant.  They could deport him.  They might well deport him.

2  And that would -- that would be a process over which we would

3  have no control.

4  And I did want to address further Mr. --

5  THE COURT:  Hold on.  Let me just follow up on that

6  thought.  Just hold that thought that you wanted to make.

7  It has troubled me for years the argument that the

8  reason a person should be detained because the left arm of the

9  government might deport somebody who's being prosecuted by the

10  right arm of the government.  How can that happen?

11  I've entered orders before enjoining INS or

12  Immigration Services -- I think it was INS back then -- from

13  deporting somebody until the case is over.  They're materially

14  interfering in a federal felony prosecution by deporting

15  somebody.

16  That's outrageous to me.

17  MS. MCDONALD:  I understand the tension built into

18  this problem.  And it has bedeviled us.  But the truth is that

19  INS is not subject to at least our -- our requests that they

20  not proceed and deport someone.

21  It is -- It is also a problem that if they keep him in

22  custody and deportation proceedings continue and maybe go on

23  past court dates, I don't know how we would get him over here.

24  I'm sure there's a mechanism, but we would likely have to writ

25  him back here every time there's a court appearance for which

1   his presence is necessary.

2       THE COURT:  You're telling me that John Leonardo, who

3   is the U.S. Attorney, can't sit down with the special agent in

4   charge of immigration, and they can't work out an arrangement

5   that's fair to everybody in this particular case, and

6   immigration doesn't deport somebody who's being prosecuted and

7   thereby interfere -- I mean, you know, Mr. Hernandez may want

8   to be able to clear his name just as much as the government

9   wants to have a trial to put him behind bars.  Just the concept

10  is just troubling to me.

11      MS. MCDONALD:  But, Your Honor, typically the way it

12  happens -- and there is some sense to this procedure -- is that

13  the criminal matter really is more significant and takes

14  precedence over the immigration proceedings.  And that's

15  usually why defendants for whom there is a deportation detainer

16  are detained in federal court, thereby, in essence, holding the

17  deportation proceedings in abeyance.  It's almost like a

18  de facto stay.

19      And that --

20      THE COURT:  What's wrong with that?

21      MS. MCDONALD:  There is some sense to that procedure

22  where he's detained in the criminal case so that we don't lose

23  control over him, and that is the culture that has sprung up.

24      I am unaware that my boss, the U.S. Attorney, has the

25  ability to force immigration to do anything.

UNITED STATES DISTRICT COURT

1          THE COURT:  Aren't you all part of the executive

2     branch of the government?

3          MS. MCDONALD:  Immigration is -- Well, now it's within

4     the Department of Homeland Security.  So when it was seated

5     within the Department of Justice, it might have been a little

6     more plausible to imagine that we could exert control.  But now

7     that they're in a separate department of the government, I

8     think it becomes even more attenuated and more difficult.

9          THE COURT:  But is it not still part of the executive

10    branch?

11         MS. MCDONALD:  Yes, Your Honor.  One of the other

12    points that I think bears some discussion is that Mr. Morgan

13    has asserted in his initial moving papers that the defendant

14    qualifies for Dream Act status.

15         And I proffered to the Court at his original detention

16    hearing the I-213, which was an INS report filled out -- record

17    of deportable/inadmissible alien -- that was filled out

18    sometime around June of 2011 when he was released from state

19    custody where he admitted that he had entered the United States

20    illegally in December of 2006 by just coming across the border.

21         So I would argue that that would not seem to qualify

22    him for any track to be made admissible and legitimate in the

23    United States.

24         So it's the view of the government that deportation is

25    inevitable.

1          THE COURT:  It seems to me when you say Dream Act,

2     you're not talking about the statute that was not passed and

3     signed into law.  You're talking about the executive order that

4     President Obama issued?

5          MS. MCDONALD:  Yes.  I don't mean to misquote

6     Mr. Morgan, but he has asserted that the defendant qualifies

7     for some track to citizenship.  And the government is somewhat

8     skeptical of that assertion.

9          MR. MORGAN:  May I address the Court, Your Honor?

10          THE COURT:  Hold on a second, Mr. Morgan.  I promise

11     you you'll have your turn.  Just make notes.

12          Now, you wanted to make another statement or explain

13     another thought a moment ago, and I rudely interrupted you.

14     And was that it?

15          MS. MCDONALD:  That was it.

16          THE COURT:  Okay.  All right.

17          Before I turn my attention to Mr. Morgan, what else

18     would you like for me to know about why Mr. Hernandez should

19     remain detained?

20          MS. MCDONALD:  That would be the sum of the

21     government's arguments.

22          THE COURT:  Have we covered it all?

23          MS. MCDONALD:  Yes.

24          THE COURT:  Okay.  All right.  Mr. Morgan, you may

25     proceed by proffer and of course respond to the assertions made

1  by the government.

2  MR. MORGAN:  Judge, when I originally made my motion,

3  it was because of the discovery I received, which consisted of

4  the newspaper articles, the notes from Dean Stewart, the public

5  defender in California who initially chased down Mr. Chambers

6  and basically got him chased out of the DEA, and the DEA notes

7  on some of the cases.

8  THE COURT:  All right.  You win on that issue.  Okay?

9  But, I mean, they can still probably make their case without

10  him even being in the courthouse unless you disagree with that

11  statement.

12  MR. MORGAN:  And I was going to -- I was headed --

13  That's the direction I was headed, Judge.  Since then

14  Mr. Stewart from California gave me the management review

15  utilization for Mr. Chambers, because this initiated a huge,

16  huge investigation, and there's a 160-page investigation.

17  I've marked into evidence a portion of that management

18  review that just has the conclusions, the 16 cases of perjury,

19  the -- what they found, and some of the conclusions of the DEA.

20  And I would move that into evidence for the Court to

21  review.

22  THE COURT:  All right.  Any objection?

23  MS. MCDONALD:  No objection.

24  THE COURT:  All right.  It is received for purposes of

25  this hearing only.  And I see that it is redacted.

UNITED STATES DISTRICT COURT

1          Does it say --

2          MS. MCDONALD:  Your Honor --

3          THE COURT:  Yes.

4          MS. MCDONALD:  -- being that this hearing is sealed,

5   this will remain sealed?

6          THE COURT:  I'm going to give this back to Mr. Morgan.

7   That's our procedure, that any exhibit received at a detention

8   hearing is returned to the attorney for safekeeping.  So it

9   will be returned to you, Mr. Morgan.

10          MS. MCDONALD:  Thank you.

11          THE COURT:  Yes.

12          MR. MORGAN:  That's fine.  If -- Judge, the first part

13   of the exhibit is simply an outline of what was covered, and

14   then you get to the conclusions.

15          THE COURT:  What page is that?

16          MR. MORGAN:  It will start at Page 101, which is about

17   the fifth page down.  And it starts off with the payments made

18   to him.  A million eight is what they estimate on DEA alone.

19   Then the testimony.  Then there is a synopsis of the 16 cases

20   of perjury by Mr. Chambers.

21          And on the bottom of 101 it says, "The management

22   review team --" it's put in here as MRT -- "determined that

23   Chambers testified as a witness in approximately 25 DEA cases.

24   He provided false testimony in 16 trials and sworn depositions.

25   The MRT did not uncover any instance where Chambers testified

1    falsely as to any substantive facts underlying a criminal

2    charge against a defendant.  Rather, the false testimony for

3    the most part involved his arrest record, level of education,

4    and payment of income taxes."

5          Mr. Stewart, who investigated this gentleman

6    extensively, disagrees with that statement and says that

7    Chambers testified falsely in numerous cases amounting to

8    entrapment.

9          THE COURT:  Okay.  So where are you going with this?

10   Are you going to be filing a motion to dismiss for

11   prosecutorial misconduct by using him, or what -- Where is this

12   going?

13         MR. MORGAN:  Judge, where it's going to go, Judge, is,

14   as I put in the original papers here, it's my intent, once we

15   get all of the discovery done, to file a motion to dismiss the

16   charges for -- under the Supervisory Powers Doctrine and also

17   for outrageous governmental conduct in bringing him back to

18   testify.

19         Now, this is a new theory that's never been tried

20   before, and I understand that.  But I'm sort of like a guy that

21   likes new theories.

22         Judge, there's -- one of the things that I'm pointing

23   to with this line is that there are unrecorded conversations

24   between my client and Mr. Chambers, and those are the initial

25   conversations.  And we do not believe, as the government has

1     alleged, that Mr. Chambers just showed up at a carniceria on

2     the corner, got just out of camera range with his vehicle, went

3     up and waited, and basically waited for my client to say, "What

4     are you doing here?  Are you going to rob my store?" and then a

5     conversation occurred.

6          Some of the background on this case is my client had

7     been under investigation for months.  He had pole cameras at

8     his house, at his business.  He had been approached by the DEA

9     and asked to be a CI for them.  He had been approached by

10    Chandler PD and asked to be a CI for them.  And he had turned

11    them both down.  They knew he was not doing anything because

12    they were watching him every day.

13         So there's an entrapment defense here that will come

14    down in the event that Chambers gets on the stand.  So --

15         THE COURT:  Are you aware of any report by the DEA or

16    other law enforcement agency recommending the government or

17    that agency not use Mr. Chambers for any further purposes?

18         MR. MORGAN:  Yes, Your Honor, I am.

19         THE COURT:  What is that?

20         MR. MORGAN:  Janet Reno fired him in 2000.

21         THE COURT:  Okay.

22         MR. MORGAN:  And we don't know how he got back into

23    the fold.  We do know that he was -- his use here was approved

24    at the higher levels of management in the U.S. Attorney's

25    Office.  And I know that because I had a conversation with

1    them.  I asked them to dump this case and to dump him as an

2    informant.  And so we've had that discussion.

3         Now, we have no information as to what Mr. Chambers

4    has been doing since 2008 when he came back.  But certainly

5    this is going to include a lot of Brady and Giglio material,

6    because this is a gentleman who, regardless of what the

7    government wants to characterize him as, he's a professional

8    con artist.  He's a professional liar.  He has lied to DEA.

9    He's lied to the U.S. Attorney's Office.  He's lied to -- on

10   the stand to juries, to judges, to everybody in the world.

11        And the cases in 2000 were dismissed all over the

12   country with respect to this gentleman.  We see no reason why

13   they shouldn't be dismissed again.

14        THE COURT:  Well, that's for Judge -- Chief Judge

15   Silver to address, and I'm not going to -- I'm not going to

16   consider what may happen with respect to this case in light of

17   your novel arguments that you've just mentioned.

18        You know, I'm ready to rule.  I don't know if you want

19   to provide anymore proffer or not, Mr. Morgan.

20        MR. MORGAN:  The only thing that I would proffer,

21   Judge, is his family's here.  You realize that he's got

22   significant ties to the community.  He has no significant

23   criminal history.  And if you do grant him a bond, we believe

24   that we will be able to get him released by immigration.  And

25   just like we did before, he was out on an immigration release

1   before.  He will -- I think a bracelet is proper here.  He's

2   got a business to run.  He's got horses to run.  And he's not

3   going anywhere.  With that, Judge, that's it.

4   　　　　THE COURT:  All right.  I want to hear what

5   Ms. McDonald has to say in rebuttal.

6   　　　　MS. MCDONALD:  Your Honor, I only have one point that

7   I wanted to make.  Defense counsel has said that Janet Reno

8   fired him in 2000, and --

9   　　　　THE COURT:  I don't think he said the year that Janet

10  fired him, but he did say 2000, and he did say that Janet Reno.

11  He didn't make that connection, at least in my mind.

12  　　　　MS. MCDONALD:  But, Your Honor, if he had read the

13  entirety of the management review, he would have discovered

14  that that was -- that claim was investigated thoroughly because

15  it was reported in a number of newspapers, and it was found to

16  have no support.  There exists within the Department of Justice

17  no document, no individual that supports that assertion in any

18  way.

19  　　　　THE COURT:  All right.  Thank you, Ms. McDonald.  Let

20  me make a couple of preliminary findings, some of which I have

21  already stated in this case before, and that is by virtue of

22  one or more of the charges in the indictment, a rebuttable

23  presumption arises that Mr. Hernandez is a serious flight risk

24  and a danger to the community.  I find that he has rebutted

25  that presumption of danger in light of the very minimal

1    criminal history.  Although one is a misdemeanor, and it is a

2    crime of violence, that certainly doesn't rise to the level of

3    clear and convincing that's required under the Act.

4         I do find that he's rebutted the presumption that he's

5    a serious flight risk.  I'm going to release Mr. Hernandez on

6    electronic monitoring and home detention.  I'm not going to do

7    it today.  I'm going to probably do it -- I'm going to bring

8    him up bag and baggage.  Today's Wednesday.  It might be

9    tomorrow.  It might be Friday.

10        I need to get some more input from the government.

11   I'm willing to give you until Friday morning.  I do want to get

12   pretrial services involved here to do a check out of his home

13   to make sure we have the telephone system that we need to have

14   electronic monitoring and in his -- Where is his office -- his

15   store located, Mr. Morgan, do you know?

16        MR. MORGAN:  It's 35th Avenue and Southern.

17        THE COURT:  Okay.

18        MR. MORGAN:  And his house is in the area also.

19        THE COURT:  Okay.  And so we may need to -- I want him

20   to be able to work there, but I still want him to be monitored.

21   I'm not going to require a bond.  I absolutely think that's the

22   right thing to do in this case.  Now, the government may be

23   able to make its case without Mr. Chambers.  That's their

24   decision to make.  And Mr. Hernandez is well aware that even

25   though I'm releasing him on the day we set the bag and baggage

1    hearing, he may not get out of immigration custody because of

2    the hold.

3          And I think, candidly, Mr. Morgan, that, as a

4    non-Article III judge, any motion to enjoin the government from

5    deporting your client needs to go to the trial judge in this

6    particular case, because, candidly, I may not have jurisdiction

7    to enjoin Immigration and Customs Enforcement and their agent

8    in charge or even the director of that agency from removing him

9    from the United States and interfering with this criminal

10   prosecution.

11         And so what you do in that regard is up to you.  I'm

12   not directing you on how to practice law.

13         So, Ms. McDonald, I assume Friday morning works for

14   you.  If you want to get a stay from Chief Judge Silver, that

15   gives you some time to do that.  But I'm going to go ahead and

16   set it for Friday morning.  I'm going to get pretrial services

17   involved.

18         I may have his wife and perhaps the other ladies go

19   down to pretrial, and maybe to expedite the process they could

20   meet with somebody down there on, you know, his home and the

21   kind of phones that he has and the business.  I want him to be

22   able to go to work, to go to his home, and maybe a few other

23   things like church, if you go to church, or medical

24   appointments and clearly to meet with his lawyer and so forth.

25         But, you know, you're not going to be able to stay out

1 all night, you know, outside of your home.  Okay?

2    So you're going to, like, be grounded, kind of like

3 I'm your parent.  So you're going to have a curfew, can't leave

4 your house after a certain time, and so forth.  Sherise, look

5 at my calendar and see what I've got Friday morning.

6   (Conference between the Court and clerk.)

7    THE COURT:  I don't know if either of you have your

8 calendars with you or not.  I'm thinking about Friday at 11:00.

9    MR. MORGAN:  Judge, you set it; I'll be here.

10    THE COURT:  Okay.  Ms. McDonald, does that time create

11 a conflict for you or not?

12    MS. MCDONALD:  Yes, Your Honor, but I am left to

13 wonder what of the immigration hold.  I do not believe that the

14 defendant will in fact leave the courthouse on --

15    THE COURT:  Well, that's not my problem.  I don't have

16 jurisdiction over immigration.  And if that is the case, then

17 Mr. Morgan needs to do what he told me he likes to do, novel

18 things, and think outside the box.  Okay?

19    All right.  So we'll set it for a bag and baggage.

20    Ladies, he'll be up here in his regular clothes on

21 Friday at 11:00.  You need to understand that he may not be

22 getting out of custody, that he's going to stay in custody, and

23 he's not going to get credit for the time that he's spending

24 after Friday on this case because I released him.  Okay?

25    So, you know, it's just like, you know, a total

1    different jurisdiction is handling the immigration over the

2    Court.  Okay?  That's the executive branch of the government.

3    I'm in the judicial.  Okay?

4          All right.  Anything else for the record,

5    Ms. McDonald?

6          MS. MCDONALD:  No, Your Honor.

7          THE COURT:  Mr. Morgan?

8          MR. MORGAN:  No, thank you, Your Honor.

9          THE COURT:  We are adjourned.

10      (Proceedings recessed at 2:35 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, LINDA SCHROEDER, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 6th day of November, 2012.


s/Linda Schroeder
Linda Schroeder